**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| CAPE GEORGE LAND COMPANY, LLC, a Washington limited liability company; GUN CLUB LAND COMPANY, LLC, a Washington limited liability company; MADMAX1984, LLC, a Washington limited liability company; and COUNTRY PROPERTIES, LLC, a Washington limited liability company, | No. 59366-1-II |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| JEFFERSON COUNTY, a political subdivision of the State of Washington; | |
| Respondent. | |

CHE, J.—Cape George Land Company, LLC, Gun Club Land Company, LLC, Madmax1984, LLC, and Country Properties, LLC, (collectively the petitioners) appeal the superior court's denial of their Land Use Petition Act (LUPA) petition. In the petition, the four appellants challenged Jefferson County's Department of Community Development's (DCD) denial of their boundary line adjustment (BLA) applications.

The petitioners applied to adjust the boundary lines of three plats recorded before 1937 through Jefferson County's BLA process. At the time of their applications, all three plats were located in a rural area that had a zoning classification that allowed for one residential dwelling unit per five acres. The petitioners' proposal requested the approval of lots that would be inconsistent with this zoning classification.

When Cape George submitted its application, DCD stated in a memorandum that the county should accept the application as a boundary line adjustment, despite its inconsistency with the zoning classification. Shortly after, Gun Club, MadMax1984, and Country Properties submitted their two BLA applications. Twelve days later, DCD returned Gun Club and MadMax1984's application for having incorrect parcel numbers. After another 27 days, DCD notified Gun Club, MadMax1984, and Country Properties that their applications were incomplete.

While Gun Club, MadMax1984, and Country Properties were working on providing DCD a complete package of documents for their applications, a moratorium on processing and reviewing BLA applications went into effect. Just before the one-year moratorium expired, Jefferson County enacted an additional ordinance, making various changes to the county's code including requiring a landowner of adjacent substandard lots to bring such lots into conformity with the county's land divisions code chapter, including its density requirements. When the moratorium expired, DCD notified Gun Club, MadMax1984, and Country Properties that their applications were not complete and requested certain documents. Gun Club, MadMax1984, and Country Properties provided the requested documents over the next 10 days.

Ten days later, DCD denied all three BLA applications. The petitioners challenged the decision in a LUPA petition before a superior court. The superior court denied their petition, and later, denied the petitioners' motion for reconsideration.

On appeal, the petitioners argue that Jefferson County erroneously interpreted the law and its code when addressing, among other things, whether a BLA could result in lots smaller than applicable zoning density. Petitioners also argue that, in determining that petitioners'

applications were incomplete and, therefore, were not vested at the time when the applications were filed, Jefferson County (1) misapplied the facts to the law, and (2) determined such without substantial evidence. Additionally, petitioners claim that Jefferson County failed to follow procedures prescribed in its own code, which they contend was not a harmless error, and violated petitioners' constitutional rights to due process. Finally, petitioners assign error to some findings and determinations of the superior court.

We hold that Jefferson County did not erroneously interpret the law and its code when it determined that a BLA must comply with the applicable zoning density and when it then accordingly denied the petitioners' applications. Holding such, we (1) decline to address the petitioners' additional arguments related to vesting and (2) hold that petitioners' arguments related to the county's failure to follow procedures fail because any error would be harmless. Finally, we hold that petitioners' constitutional due process arguments fail.

Accordingly, we affirm the superior court's denial of the appellant's LUPA petition.

FACTS

This case concerns a LUPA action following the DCD's denial of three BLA applications for the petitioners' three plats recorded before 1937. At the time of the applications, each plat was undeveloped other than two existing driveways used for access to neighboring homes on each of Gun Club, MadMax1984, and Country Properties' two plats. Each plat had a zoning classification of "RR 1:5" meaning that Jefferson County's zoning code allowed for one residential dwelling unit per five acres. Jefferson County Code (JCC) 18.15.015(1)(a), .055.

On December 30, 2020, Cape George applied for a BLA to adjust the boundary lines of a plat recorded in Jefferson County in 1890.[1] *See* Clerk's Papers (CP) at 4430 (agreed to judgment between the parties describing recording date of the "Irvington Addition to the City of Port Townsend"), 4434 (map of the recorded plat). In its application, Cape George proposed modifying the plat's more-than-100 lots to create 70 building sites for single family homes with a minimum lot size of 12,500 square feet.[2]

On May 3, 2021, DCD's interim director reviewed and approved a memorandum related to Cape George's application. The memorandum concluded that the Cape George plat was consistent with two Washington attorney general opinions,[3] the JCC, and Jefferson County's Comprehensive Plan. The memorandum then stated:

> [T]his plat is accepted, which allows the alteration of its boundary lines. Jefferson County should accept this application as a boundary line adjustment to allow development of this platted land in conformance with all current development regulations (except RR5 density or minimum land area for the RR5 zoning district), conditions, SEPA, and any other applicable codes and ordinances that regulate development.

CP at 910.

---

[1] A plat is defined by RCW chapter 58.17, Plats—Subdivisions—Dedications, as "a map or representation of a subdivision, showing thereon the division of a tract or parcel of land into lots, blocks, streets and alleys, or other divisions and dedications." RCW 58.17.020.

[2] Cape George later modified its proposal multiple times to eventually reduce the number of building sites to 56 lots or, as an alternative, 50 lots, each with a minimum lots size of 15,000 square feet. *See* CP at 962-63 (changing to 68 lots on July 6, 2021), 1743 (changing to 67 lots on March 22, 2022), 2026 (changing to 56 or 50 lots on December 9, 2022).

[3] The memorandum relied on the following attorney general opinions (AGOs): AGO 1996 No. 5, "Effect of 1969 Platting Act on land platted before enactment," and AGO 1998 No. 4, "Effect of Growth Management Act on option of counties to require resubdivision of lands platted before 1937." *See* CP at 909-10; https://www.atg.wa.gov/ago-opinions-year.

On May 19, 2021, Gun Club and MadMax1984 submitted a BLA application "[t]o divide eight [] tax parcels containing 91 old (1890) platted lots within Salem's Addition Plat into 18 building lots plus additional open space lots, on 15.5 acres."[4] CP at 4715. Attached with the application was a letter from a Gun Club and MadMax1984's representative, authorizing David Clarke, Cape George's property owner and BLA manager, to submit applications related to the Salem's Addition plat.

On the same date, Country Properties also submitted a "[p]roposed BLA of [40] old (1890) platted lots on five [] tax parcels into [28] home sites" for a 9.97-acre property. CP at 4733. In the Country Properties' application, it listed the property owner as "Country Properties LLC - C/O Dave Clarke." CP at 4736. Clarke signed the application as the property owner.

On May 31, 2021, DCD returned Gun Club and MadMax1984's application "due to incorrect parcel numbers." CP at 2136. A revised application with corrected parcel numbers was sent back to and received by DCD that same day.

DCD notified the Gun Club, MadMax1984, and Country Properties on June 27, 2021, that the property owner listed in the Assessor's records for the Gun Club and MadMax1984 property was different from the property owner listing on the BLA application.[5] DCD stated

---

[4] The BLA listed the property owner as "Norman Glassman (POA)"; however, both Gun Club and MadMax1984 conceded that they filed this BLA. CP at 4719 (BLA's listed owner for MLA 21-00103/104); Br. of Appellant at 12 (stating "MadMax and Gun Club filed their boundary line adjustment application for lots within Salem Addition on May 19, 2021," citing to "CP 4712-4727," and the referring to the project as "MLA 21-00103").

[5] Jefferson County contends that it requested this additional information on June 20, 2021. However, the record reflects that DCD sent its June 20, 2021 email to the wrong contact email address (sending the email to "daveclarke@msn.com" instead of "daveclarkex@msn.com."). CP at 2139. On June 27, DCD emailed the correct email address and stated, "Looks like this went to the wrong email, so I'm sen[ding] it again." CP at 2139.

that it needed the current property owner's signature in the application. DCD also requested

"relevant documents" that were missing from both applications. CP at 2139. On September 10,

2021, Gun Club, MadMax1984, and Country Properties notified DCD that they "should (finally)

have a complete package of documents for both applications next week." CP at 2146.

On October 4, 2021, Jefferson County's Board of Commissioners (Board) adopted

Jefferson County Ordinance (JCO) 05-1004-21, which declared an emergency and established a

moratorium on accepting and processing certain land use and building regulation applications. A

week later, the Board repealed and replaced the ordinance with JCO 06-1011-21. The

replacement ordinance established:

> an immediate moratorium on the acceptance, processing, review or issuance of any application for a permit for boundary line adjustment, binding site plan, plat alteration, segregations, or exemptions pursuant to JCC 18.35.040 and JCC 18.30.050, any application for an on-site sewage system permit pursuant to Chapter 8.15 JCC or any request for lot certification through any uncodified process or procedure, which requires recognition of a legal lot of record or a plat in existence prior to September 7, 1971.

CP at 2307. The Board declared that the moratorium "must be imposed as an emergency

measure to prevent development that would result in densities incompatible with zoning, and to

prevent the submission of applications to the County in an attempt to vest rights for an indefinite

period of time." CP at 2307. The moratorium's exceptions included, "Any land use, building, or

any development application or request for a permit that is deemed complete prior to the date of

this moratorium." CP at 2308. The moratorium went into immediate effect and had a duration

of one year from October 4, 2021, unless extended by the Board.

DCD notified the petitioners that Gun Club, MadMax1984, and Country Properties' two

applications were "on hold due to the [] moratorium," but that the Cape George application was

"vested and in the review process." CP at 2298. DCD then requested additional information for the Cape George application, specifically whether each resulting lot would be "buildable" per the JCC. CP at 1327. Pursuant to this and other county requests, Cape George continued to work on its application, including submitting a revised site plan in March 2022, another revised site plan in April 2022, an update SEPA environmental checklist in May 2022, and an updated septic plan in June 2022.

On October 3, 2022, the Board adopted JCO No. 09-1003-22. JCO 09-1003-22, at 4. The ordinance amended various portions of JCC and also added a new chapter in the code. JCO 09-1003-22, at 2-3. One such change was the addition of the following requirement:

> A landowner must aggregate adjacent lots to the extent possible to bring the substandard lot to conforming status. An owner of continuous, substandard lots as of the effective date of this ordinance shall aggregate (combine) lots to meet the requirements of this chapter; and aggregation of substandard lots shall meet the underlying density if possible and be recorded as a boundary line adjustment pursuant to JCC 18.35.060 through 18.35.080. If the resulting aggregation of lots does not meet the zoning minimum lot size or underlying density, the lot must meet an exception in JCC 18.12.070(3), or the owner must apply for and receive a residential development exception pursuant to JCC 18.12.080 to be considered eligible for development.

JCO 09-1003-22, at 13-14. The ordinance went into effect on October 4, 2022. JCO 09-1003-22, at 3.

The first day after the moratorium expired,[6] on October 5, 2022, DCD sent a letter to Gun Club and MadMax1984 notifying them that their application was not complete and requesting that they submit "a completed and signed SEPA Checklist." CP at 2449. On the same day, DCD

---

[6] In its briefing, Jefferson County concedes that the moratorium expired at the end of the day on October 4, 2022.

also notified Country Properties that its application was not complete and requested "a completed and signed Permit Application form, and SEPA Checklist." CP at 2450.

On October 6, 2022, DCD received an application form related to Country Properties' application. DCD notified Country Properties that "[i]f [the attached] application is current, I can accept it for you[r] incomplete application request. . . . I will still need a completed and signed SEPA Checklist." CP at 2467. Country Properties confirmed that the attached application was the "original and current application" for Country Properties' BLA application. CP at 2467.

On October 10, 2022, two signed SEPA checklists were submitted for the Gun Club, MadMax1984, and Country Properties' two applications.

On December 20, 2022, Jefferson County denied all three of the petitioners' BLA applications. Jefferson County concluded that the applications "must be denied because the application[s] do[] not propose lots that meet current zoning, subdivision requirements, or minimum lot sizes for on-site sewage systems." CP at 2078, 3139, 4115. In doing so, Jefferson County relied on the JCC, various state statutes, and Washington's Administrative Code for on-site sewage systems.

Jefferson County also determined for Cape George's application: (1) the April 30, 2021, memorandum was issued in error and was rescinded, (2) the application was not vested, (3), even if the application were vested, the plat was not a valid land use and RR 1:5 zoning would still apply, (4) the application does not meet minimal lot size for septic, and (5) the application could not be approved under Jefferson County's BLA code. Regarding DCD's interim director's April 2021 memorandum, Jefferson County stated, "The DCD Director must implement and interpret

the County land use policy; they cannot make the County land use policy. Nothing establishes

that the County had formally made policy on this matter, and no evidence shows any uniformly-

applied interpretation." CP at 2079.

In denying Gun Club, MadMax1984, and Country Properties' BLA applications,

Jefferson County determined: (1) "[t]here [was] no basis upon which DCD may recognize the

nineteenth century plat drawing as a basis upon which to allow urban density in the rural area,"

(2) the applications were not vested, (3) even if the applications were vested, the plats were not

valid land use and RR 1:5 zoning would still apply, (4) the applications did not contain adequate

septic code compliance information, (5) the applications had to be denied under Jefferson

County's BLA code, and (6) the applications were not approvable because the applications were

not complete before a recent county ordinance, JCO 09-1003-22,[7] went into effect. CP at 3140,

4124.

---

[7] The Board adopted JCO 09-1003-22 on October 3, 2022. JCO 09-1003-22, at 4. The ordinance amended JCC 18.10.040, .120; 18.35.060-.080. JCO 09-1003-22, at 2. The ordinance also added a new chapter to JCC, chapter 18.12, and a new article to JCC chapter 18.40. JCO 09-1003-22, at 2-3. One change was adding the following requirement:

> A landowner must aggregate adjacent lots to the extent possible to bring the substandard lot to conforming status. An owner of continuous, substandard lots as of the effective date of this ordinance shall aggregate (combine) lots to meet the requirements of this chapter; and aggregation of substandard lots shall meet the underlying density if possible and be recorded as a boundary line adjustment pursuant to JCC 18.35.060 through 18.35.080. If the resulting aggregation of lots does not meet the zoning minimum lot size or underlying density, the lot must meet an exception in JCC 18.12.070(3), or the owner must apply for and receive a residential development exception pursuant to JCC 18.12.080 to be considered eligible for development.

JCO 09-1003-22, at 13. The ordinance went into effect on October 4, 2022. JCO 09-1003-22, at 3.

The petitioners filed a joint LUPA petition in superior court, appealing Jefferson County's denial of their three BLA applications.[8]  The superior court issued a Memorandum Opinion denying the LUPA petition.  The petitioners then moved for reconsideration and the superior court denied their motion.

The petitioners appeal.[9]

## ANALYSIS

### I.  LUPA STANDARD OF REVIEW

Judicial review of land use decisions is governed by LUPA, codified in chapter 36.70C RCW.[10]  RCW 36.70C.030.  In reviewing a LUPA petition, we stand in the same position as the superior court.  *Ellensburg Cement Prods., Inc. v. Kittitas County*, 179 Wn.2d 737, 742, 317 P.3d 1037 (2014).  A court may grant relief to a petitioner only if the petitioner has established one of the following standards:

> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

---

[8] Cape George, Gun Club, MadMax1984, and Country Properties later moved to amend their petition to add non-LUPA claims.  The superior court granted their request to amend their complaint but bifurcated the LUPA appeal and the non-LUPA claims and stayed consideration of the non-LUPA claims until resolution of the LUPA appeal.

[9] On May 2, 2024, the superior court entered a final judgment as to the LUPA claim, allowing this appeal while the non-LUPA claims remain stayed.

[10] The parties do not dispute whether the denial of the BLA applications are a land use decision governed by LUPA.

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1). Here, the petitioners challenge the superior court's decisions under standards (a), (b), (c), (d), and (f).

Standards (a), (b), and (f) present questions of law, which we review de novo. *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011).

Standard (c) concerns a factual determination that we review for whether substantial evidence supported it. *Cingular Wireless, LLC v. Thurston County*, 131 Wn. App. 756, 768, 129 P.3d 300 (2006). "Substantial evidence is evidence that would persuade a fair-minded person of the truth of the statement asserted." *Id.* In reviewing a sufficiency of the evidence challenge under standard (c), "we view facts and inferences in the light most favorable to the party that prevailed in the highest forum exercising fact-finding authority." *Phoenix*, 171 Wn.2d at 828-29.

Standard (d) requires this court to review the application of the law to the facts and determine "whether we are left with a definite and firm conviction that a mistake has been committed." *Cingular Wireless*, 131 Wn. App. at 768. We also defer to factual determination of the highest fact-finding forum below in making this determination. *Id.*

Finally, we may affirm or reverse the land use decision under review or remand it for modification or further proceedings. RCW 36.70C.140. "If the decision is remanded for modification or further proceedings, the court may make such an order as it finds necessary to

preserve the interests of the parties and the public, pending further proceedings or action by the local jurisdiction." RCW 36.70C.140.

## II. JEFFERSON COUNTY'S DENIAL OF THE BLA APPLICATIONS

Petitioners argue under multiple standards that Jefferson County and the superior court erred in determining that the BLA applications were in violation of the density requirements for RR 1:5 zoning and that, therefore, the applications must be denied. Petitioners contend that their applications were consistent with the lot size requirements for properties zoned under the RR 1:5 classification and that the BLA process was the proper process to develop their lots. Jefferson County responds by asserting that all of the applications failed to follow the county's zoning requirements as required by both statute and the county code. We agree with the county.

The legal question at issue is whether, under chapter 58.17 RCW and the JCC, a BLA could result in a lot smaller than the applicable zoning density requirements.

The interpretation of a statute is a question of law we review de novo. *Ellensburg*, 179 Wn.2d at 743. "Our duty in conducting statutory interpretation is to 'discern and implement' the legislature's intent." *Id*. If a statute's plain language is unambiguous and, therefore, apparent evidence of the legislative intent, "we will not construe the statute otherwise." *Id*. "Plain meaning may be gleaned 'from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question.'" *Id.* (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)). A statute is ambiguous if it is amenable to two reasonable interpretations. *Lakeside Indus. v. Thurston County*, 119 Wn. App. 886, 896, 83 P.3d 433 (2004). Statutory construction principles also apply when interpreting county ordinances. *See Ellensburg*, 179 Wn.2d at 743.

First, we consider the state's statute governing subdivisions, chapter 58.17 RCW. Assuming without deciding that all three applications vested at the time of their submittal to the county, we apply the law and regulations that would have been in effect prior to the county's October 3, 2022, ordinance.

Chapter 58.17 RCW requires "every subdivision" to comply with the chapter's provisions. RCW 58.17.030. The statute defines a "subdivision" as "the division or redivision of land into five or more lots, tracts, parcels, sites, or divisions for the purpose of sale, lease, or transfer of ownership, except [a short subdivision]." RCW 58.17.020(17). A "short subdivision" is the "division or redivision of land into four or fewer lots, tracts, parcels, sites, or divisions for the purpose of sale, lease, or transfer of ownership" or up to nine lots, tracts, or parcels if the legislative authority of a city, town, or county planning has increased the number in a certain way and in certain areas. *See* RCW 58.17.020(16).

The parties do not dispute whether the BLA applications proposed short subdivisions; instead, they dispute whether petitioners' proposed applications fell within the purviews of the chapter as determined by the county's zoning regulations. Their dispute centers around another statute in the chapter, RCW 58.17.040, and the county's code.[11]

The relevant portion of RCW 58.17.040 provides:

The provisions of [chapter 58.17 RCW] shall not apply to:

> (6) A division made for the purpose of alteration by adjusting boundary lines, between platted or unplatted lots or both, which does not create any additional lot, tract, parcel, site, or division nor create any lot, tract, parcel, site, or division which contains insufficient area and dimension to meet minimum requirements for width and area for a building site.

---

[11] We cite to the current version of RCW 58.17.040 and RCW 58.17.020 as a recent amendments to those statutes did not change the substantive portion of the statutes at issue.

Under the plain language of this provision, if a proposal for adjusting boundary lines either creates "any lot . . . which contains insufficient area and dimension to meet minimum requirements for width and area for a building site," that proposal is subject to the requirements of chapter 58.17 RCW. *See* RCW 58.17.040(6). RCW 58.17.020 defines a "lot" as "a fractional part of divided lands having fixed boundaries, being of sufficient area and dimension to meet minimum zoning requirements for width and area." RCW 58.17.020(10). Reading these two provisions together, a BLA proposal cannot qualify under RCW 58.17.040(6) if the proposal creates a lot inconsistent with zoning requirements for width and area.

We turn next to Jefferson County's code to consider whether the county's zoning requirements for width and area apply to pre-1937 plat BLA applications. We conclude that the code is ambiguous on this point.

Under the Growth Management Act, chapter 36.70A RCW, counties must adopt comprehensive plans that include "a rural element including lands that are not designated for urban growth, agriculture, forest, or mineral resources." RCW 36.70A.070(5).[12] A comprehensive plan's rural element must also include "measures that apply to rural development and protect the rural character of the area, as established by the county," including by "[c]ontaining or otherwise controlling rural development." RCW 36.70A.070(5)(c)(i).

Through JCC chapter 18.15, Jefferson County establishes land use classes and then "districts" falling within certain land use classes. JCC 18.15.005; *see* JCC 18.15.015 ("Rural lands"). The rural lands class includes a "Rural Residential 1 Unit/5 Acres (RR 1:5)" district.

---

[12] We cite to the current statute as, between 2020 and 2022, the applicable sections have remained unchanged.

JCC 18.15.015. Another subsection, JCC 18.15.055(1), provides, "The maximum allowable residential density for all parcels is shown on the official maps of the Jefferson County Comprehensive Plan."

Jefferson County code describes the RR 1:5 district's purpose as being:

to allow for continued residential development in areas of Jefferson County consisting of relatively high density pre-existing patterns of development, along the county's coastal areas, and within areas within or adjacent to rural centers and rural crossroads. In addition, this district seeks to support and foster Jefferson County's existing rural residential landscape and character by restricting *new land divisions* to a base density of one unit per five acres.

JCC 18.15.015(1)(a) (emphasis added).

The county asserts that the RR 1:5 district base density is a requirement for "all *parcels* in that zone." Resp't's Br. (Corrected) at 54. Petitioners, on the other hand, argue that the BLAs of pre-1937 plats are not subject to the county's RR 1:5 density requirements because their applications are not "new land divisions" and the proposed plats were in areas of "continued residential development." *See* Reply Br. at 5. They support their interpretation of the law with, among other things, the county's definition of a BLA.

Under the JCC, a BLA is defined as "the relocation or other adjustment of the boundaries of a lot, tract or parcel, in which the relocation neither results in the creation of any additional lot, tract or parcel nor results in creation of any lot, tract or parcel which is more nonconforming or insufficient in area or dimension." JCC 18.10.020.

With JCC 18.15.015(1)(a)'s use of the term "new land divisions" and the code's definition of a BLA, reasonable minds could differ whether that portion of the code applies to BLAs. From the plain language of the code, it is not clear that a BLA, which is defined as a "relocation or . . . adjustment of [] boundaries," is a "land division," nevertheless a "new" one.

15

Additionally, chapter 18.10 JCC's definition of a "[l]and [d]ivision" does not clarify but only adds confusion to what the code means here. *See* JCC 18.10.120 (referring the definition to that of a "Division of land."). A "[d]ivision of land" is defined in the code as "the creation of any new lot or lots *for the purpose* of sale, lease, or transfer of ownership (see Chapter 18.35 JCC)." (emphasis added). While Chapter 18.35 JCC contains the county's BLA regulations, the definition of a BLA does not specify a purpose, nevertheless include one of the purposes outlined in JCC 18.10.120. Because the code is amenable to two reasonable interpretations, the county's code is ambiguous as to whether BLA applications must conform with the RR 1:5 zoning density.

When an ordinance is ambiguous, our goal is "to determine legislative purpose and intent." *Milestone Homes, Inc. v. City of Bonney Lake*, 145 Wn. App. 118, 126, 186 P.3d 357 (2008). Additionally, "in construing ambiguous zoning Ordinances, we are guided by the reasonable expectation and purpose of the ordinary person who enacts law for the welfare of the general public." *Milestone Homes*, 145 Wn. App. at 126-27, 130.

Jefferson County's stated purpose for chapter 18.35 JCC includes "[p]revent[ing] the overcrowding of land," "[l]essen[ing] congestion and promot[ing] safe and convenient travel," "[p]romoting the efficient use of land," and "[i]mplementing the goals, policies and substantive requirements of the [GMA] and the Jefferson County Comprehensive Plan." JCC 18.35.020.

Alongside the requirements mentioned above and stating that a county's comprehensive plan must have a rural element permitting rural development in rural areas, the GMA also states:

> To achieve a variety of rural densities and uses, counties may provide for clustering, density transfer, design guidelines, conservation easements, and other innovative techniques that will accommodate appropriate rural economic advancement,

densities, *and uses that are not characterized by urban growth and that are consistent with rural character*.

RCW 36.70A.070(5)(b) (emphasis added). When Jefferson County adopted its comprehensive plan in 2018, the plan recognized that "[s]ome areas zoned for residential uses have smaller lots platted prior to 1998 than would be allowed with new plats." CP at 4208. But the plan then noted, "However, in terms of development, some of the smaller lot sizes could require consolidation with other lots to meet current Health Department standards for wells or septic areas, *or to meet other regulations*, such as critical areas." CP at 4208 (emphasis added).

It is undisputed that the proposed lots fell within the zoning district RR 1:5 which, generally, requires a density of one residential unit per five-acre lot. At the time the petitioners submitted their applications, the county's BLA code, Article II of chapter 18.35 JCC, provided that the county could not approve a proposed BLA if the adjustment would, among other things:

> Result in a lot, tract, parcel, site within a binding site plan or division that contains increased density or insufficient area or dimension to meet the minimum requirements for area and dimension as set forth in Chapter 18.15 JCC and state and local health codes and regulations.

JCC 18.35.080(2)(b) (2017), *modified by*, JCO 09-1003-22 (App. A), at 24 (Oct. 3, 2022). Chapter 18.15 JCC referenced in the county's BLA code was the same chapter that provided the RR 1:5 zoning density.

Given that the purpose for the code chapter governing BLAs includes implementing the goals, policies, and requirements of the GMA and the county's comprehensive plan, and the fact that the BLA code refers to the county's code providing the county's zoning districts and their densities, the county's interpretation that its code requires BLAs to comply with their zoning density requirements is more persuasive than the alternative.

Petitioners contend that the county's interpretation is inconsistent with the county's comprehensive plan and instead rely either on language from a prior comprehensive plan or the plan's described criteria for designating an area under the RR 1:5 zoning designation. These arguments are unpersuasive. Petitioners refer to the county's 1998 plan as evidence that there was a "policy that [] small 'last century' lots could be developed if they were combined together to form lots of at least 12,500 square feet, if the lots have access to public water, in order to accommodate a 'septic system.'" Br. of Appellant at 31 (citing to CP at 4190). However, the page cited to is titled, "Inventory and Analysis of Rural Development Patterns," and appears to discuss how Jefferson County Long-Range Planning staff conducted a land use inventory as opposed to presenting a policy of the comprehensive plan. *See* CP at 4190.

Petitioners also rely on the county's definition of a "lot, buildable" to argue that "the [BLA] code was designed to allow for the development of smaller lots in these older plats."[13] Br. of Appellant at 38-39. However, this ignores that the county could not approve a BLA that

---

[13] Prior to the county's amendment of the code in 2022, the code defined a "Lot, buildable" as:

> a lot of sufficient size and location to:
> (a) Comply with all the standards and requirements of this code, with the exception of the density provisions contained herein; and
> (b) Support an on-site wastewater disposal (i.e., septic) system . . . that is consistent with the policies, standards and requirements of the Jefferson County health department and the Washington State Department of Health as they now exist or may hereafter be amended, and any other applicable policies, standards or regulations of the Washington State Department of Ecology.
> . . . .
> This definition is intended to apply only to lots of record as defined herein. With the exception of density provisions contained in Chapter 18.30 JCC, nothing in this definition shall be construed to excuse compliance with any other provisions of this code or any provision of local, state or federal law.

JCC 18.10.120 (2021), *modified by*, JCO 09-1003-22 (App. A), at 9.

resulted in a lot that increased density or contained insufficient area or dimension. The language in the BLA code's "[p]urpose, scope and limitations" provision stated the BLA process would not apply to boundary changes that "[r]esult in a lot . . . that does not qualify as a buildable lot as defined in Chapter 18.10 JCC." JCC 18.35.060(2)(b).

In construing JCOs with the goal of effectuating legislative purpose and intent, the county's determination that the petitioners' BLA applications violated the density requirements for RR 1:5 zoning, and therefore, must be denied, was not erroneous.[14] Accordingly, the superior court's similar determination in denying the LUPA petition was likewise not in error. Thus, we hold that the petitioner's arguments here fail.

### III.  PETITIONER'S REMAINING ARGUMENTS

In addition to arguing that the county erroneously interpreted the law in determining that the BLA applications were in violation of the zoning requirements for RR 1:5 zoning, petitioners raise multiple other arguments under RCW 36.70C.130(1)(a-d, and f*)*.

First, petitioners raise several other arguments under multiple RCW 36.70C.130(1) standards related to whether and when the petitioners' applications vested. Petitioners argue that the county erroneously interpreted the law when addressing "whether a SEPA checklist is

---

[14] The parties dispute whether we should defer to the county's interpretation of its code provisions. Because we conclude the better reading of the ordinances support Jefferson County's position without any such deference, it is unnecessary to resolve that question.

required to make an application complete under JCC 18.40.100 and .110,[15] when an application is deemed complete, and whether the vesting doctrine (as set forth in the [JCC]) extends to [BLA] applications." Br. of Appellant at 23. Petitioners additionally argue that the county made its determinations without the support of substantial evidence when it found petitioners' applications incomplete. Further, they contend that the county misapplied facts to the law by determining that "[p]etitioners providing Jefferson County additional information after initial filing of the applications meant that the original applications were not complete in fact." Br. of Appellant at 23.

Above, we held that, even assuming without deciding that the applications vested at the time of their submittal to the county, the county did not erroneously interpret the law in its denial of the applications. Accordingly, addressing a question of vesting would not change that holding or the county's ability to deny the petitioners' applications according to its understanding of the law. Thus, we decline to address the petitioners' additional arguments related to vesting.

Next, petitioners argue that the county failed to follow procedures prescribed by its own code by failing to provide the petitioners with notice of the alleged deficiencies in their applications, depriving the petitioners of the opportunity to cure the alleged deficiencies, and not timely processing the petitioners' applications.

---

[15] JCC 18.40.100 provides application requirements for land use permit applications, including BLA applications. JCC 18.40.100(4)(j). JCC 18.40.110, among other things, provides timing considerations for when the administrator shall notify an applicant that the application is complete or that the application "is incomplete and information necessary to make the application complete." JCC 18.40.110(1). JCC 18.40.110 also provides procedures for incomplete applications and stated that "[a] project permit application shall be deemed complete under this section if the administrator does not provide a written determination to the applicant that the application is incomplete as provided in subsection (1) of this section." JCC 18.40.110(3), (4).

A petitioner can recover relief for improper process under LUPA "unless the error was harmless." RCW 36.70C.130(1)(a). A harmless error is one that is "'not prejudicial to the substantial rights of the party assigning [error,]' and does not affect the outcome of the case." *Young v. Pierce County*, 120 Wn. App. 175, 188, 84 P.3d 927 (2004) (alteration in original) (quoting *City of Bellevue v. Lorang*, 140 Wn.2d 19, 32, 992 P.2d 496 (2000)).

Petitioners appear to contend that the alleged errors were not harmless because "[had] Jefferson County allowed its code interpretation to be placed before the hearing examiner, the various issues before this Court, minimum lot size and zoning density's relationship to a 'buildable lot,' would have been addressed by a trier of fact prior to full denial of [the] applications." Reply Br. at 37. However, petitioners fail to explain how the hearing examiner's findings of facts would have affected the outcome of the case, especially considering our conclusion that the county's interpretation of the law was not erroneous and its denial proper based on undisputed facts.

Accordingly, we hold that petitioners fail to show that any of the procedural errors would not have been harmless.

Finally, petitioners argue that the county violated their constitutional rights by failing to follow the same procedures. They assert that Jefferson County violated their due process rights by denying their applications for a lack of written verification from the county's department for environmental public health, denying their applications without first asking for required information, and delaying the processing of their applications.

Petitioners appear to bring both a procedural and substantive due process claim. Both the United States and Washington constitutions provide that no person shall be deprived of deprived of

of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1; WASH. CONST. art. 1, § 3. Our Supreme Court has held that Washington State's due process protections are "largely coextensive with that of the U.S. Constitution." *Berst v. Snohomish County*, 114 Wn. App. 245, 254, 57 P.3d 273 (2002). Accordingly, "'[a]lthough not controlling, federal decisions regarding due process are afforded great weight due to the similarity of the language.'" *Washington v. Manussier*, 129 Wn.2d 652, 679-80, 921 P.2d 473 (1996) (quoting *Rozner v. Bellevue*, 116 Wn.2d 342, 351, 804 P.2d 24 (1991).

As a threshold matter to either type of due process claim, a plaintiff must possess a property interest. *Greenhalgh v. Dep't of Corr.*, 180 Wn. App. 876, 890, 324 P.3d 771 (2014). Here, petitioners appear to assert that their constitutionally-protected property interest is their applications. However, not all property interests are constitutionally protected. *See Durland v. San Juan County*, 182 Wn.2d 55, 71-72, 340 P.3d 191 (2014) (holding that plaintiff does not have a constitutionally-protected property interest in his views of the water). "Protected property interests include all benefits to which there is a 'legitimate claim of entitlement.'" *Id.* at 70 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U. S. 564, 577 (1972). Related to such interests in a permit application, our Supreme Court has explained:

> Courts have found that a property interest exists when an applicant is entitled to a permit or variance having met certain criteria. See *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir.1998) (holding that "specific, mandatory" and "carefully circumscribed" requirements constrained discretion enough to give rise to property interest). Conversely, a statute that grants the reviewing body unfettered discretion to approve or deny an application does not create a property right." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir.2005).

*Id.* at 71.

No. 59366-1-II

Petitioners fail to show, much less argue, that any property interest that they might have qualifies as constitutionally protected. Because petitioners fail to present argument on this threshold matter, we hold that petitioner's constitutional arguments here fail. *See Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

Because petitioners fail to establish any of the standards required for relief under LUPA, we hold that Petitioner's petition fails.

CONCLUSION

We affirm the superior court's denial of petitioners' LUPA petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Che, J.

We concur:

_____
Cruser, C.J.

_____
Price, J.

23